IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TONY L. OLSON,                              )
                                            )
                        Plaintiff,          )
                                            )        CIVIL ACTION
v.                                          )
                                            )        No. 14-2474-JWL
CAROLYN W. COLVIN,                          )
Acting Commissioner of Social Security,     )
                                            )
                        Defendant.          )
_____  )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) and Supplemental Security Income (SSI) benefits under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act).  Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

## I.      Background

Plaintiff applied for DIB and SSI benefits, alleging disability beginning July 24, 2009.  (R. 19, 408, 412).  In proceedings before the Commissioner, the Administrative Law Judge (ALJ) issued a decision dated April 27, 2012 in which she determined that

Plaintiff was not disabled, and denied his applications for benefits. (R. 170-89). Plaintiff requested review, and submitted new evidence to the Appeals Council. (R. 191). The Council determined that the evidence submitted was new and material and related to the period before the ALJ's decision, and remanded for further proceedings. Id. at 191-92. On remand, the ALJ conducted additional proceedings and issued a new decision denying Plaintiff's applications. Id. at 19-47. Plaintiff again sought, but was denied Appeals Council review, and now seeks judicial review of the decision denying benefits. Id. at 1-3; (Doc. 1). Plaintiff alleges that the ALJ's residual functional capacity (RFC) finding is not supported by the medical evidence, that the ALJ erred in evaluating the opinion evidence and in her analysis of Plaintiff's allegations of limitations resulting from pain, and consequently also erred in the hypothetical presented to the vocational expert (VE).

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Section 405(g) provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052.

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner assesses claimant's RFC. 20 C.F.R. § 404.1520(e). This assessment is used at both step four and step five of the sequential evaluation process. Id.

The Commissioner next evaluates steps four and five of the sequential process--

determining at step four whether, in light of the RFC assessed, claimant can perform his

past relevant work; and at step five whether, when also considering the vocational factors

of age, education, and work experience, claimant is able to perform other work in the

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

The court finds no error in the decision at issue.  Because when she evaluated the

opinion evidence the ALJ relied upon her finding that Plaintiff's allegations of symptoms

are not credible (R. 42-44), the court will begin its discussion with consideration of errors

alleged in the credibility determination.  It then considers the ALJ's evaluation of the

medical source opinions, whether the RFC assessment is supported by record evidence

including medical evidence, and whether the hypothetical questioning was proper.

## II.     The Credibility Determination

Plaintiff argues that the medical records, Plaintiff's testimony, and the testimony of

the medical expert, Dr. Winkler, all confirm that he suffers from excruciating pain, but

that the ALJ dismissed Plaintiff's allegations as merely "false, incorrect and

4

exaggerated," and erroneously skipped consideration of whether Plaintiff's impairments could reasonably be expected to produce the pain alleged.  (Pl. Br. 44-47) (quoting R. 38). The Commissioner points out that an ALJ is not required to accept a claimant's allegations of pain without question.  (Comm'r Br. 20).  She argues that the medical opinions and other record evidence provided appropriate reasons to discount Plaintiff's credibility, and the ALJ properly did so.  Id. at 20-22.  In his Reply Brief, Plaintiff asserts that occasional symptom-free periods and the sporadic ability to work are not inconsistent with disability, and that receipt of unemployment benefits is but one factor in a credibility determination.  (Reply 5-6).  He argues that the ALJ misconstrued and ignored the medical opinions of Dr. West and Dr. Winkler in making her credibility determination.

## A.     Standard for Evaluating Credibility

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).  An ALJ must consider (1) whether the claimant has established a symptom-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling.  See, Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (explaining the Luna framework).  The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility:  Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness,

and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms.  20 C.F.R. § 404.1529(c)(3)(i-vii).  The court has recognized a non-exhaustive list of factors which overlap and expand upon the factors promulgated by the Commissioner.  Luna, 834 F.2d at 165-66.  These factors include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489).

The court's review of an ALJ's credibility determination is deferential.  Credibility determinations are generally treated as binding on review.  Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.  Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.  Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility.  Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994).

**B.      The ALJ's Findings**

6

Here, the ALJ summarized the standard she applied in her credibility determination, noting that she must find "an impairment(s) . . . that could reasonably be expected to produce claimant's pain or other symptoms."  (R. 34).  She explained that when such an impairment (or impairments) is present she must "evaluate the intensity, persistence, and limiting effects of symptoms," and when those effects are not substantiated by objective medical evidence, she "must make a finding on the credibility of Plaintiff's statements based on a consideration of the entire case record."  Id. at 35.

The ALJ noted numerous reasons to discount Plaintiff's credibility.  She noted that he reported to the agency that he could not sleep more than an hour at a time, but to his cardiologist he reported that he gets seven or eight hours of sleep each night.  Id.  He reported he was extremely impaired in "virtually all" functional areas, but two months later reported he anticipated going to work soon.  Id.  Dr. Stepp recommended only Extra Strength Tylenol for pain control, and although Plaintiff testified that he became aware he had a mental problem at his psychological evaluation by Dr. Stern, he did not seek regular treatment until almost a year later.  Id.  Plaintiff did not accurately report his ownership of, and work at, T-N-T Lil Sturgis, did not answer a direct question to that effect from the Cooperative Disability Investigative Unit (CDIU) investigator until pressed, and minimized his ownership of, and work at, the bar when questioned by the ALJ at the hearing.  (R. 35).  Plaintiff held himself out as ready, willing, and able to work for more than a year during which he received unemployment benefits.  Id. at 36.  Plaintiff appeared at the hearing using a wheelchair and using oxygen, but there is no documented

medical need for either, and when the CDIU investigator checked with his neighbors,

none of them had observed him using an assistive device or requiring assistance with

walking, using supplemental oxygen, or being chauffeured, but they had seen him driving

on "numerous occasions." Id. Plaintiff renewed his Class A Commercial Driver's

License which reflected no restrictions. Id. Plaintiff testified that his neck is swollen, he

has muscle spasms in his neck, and his head feels unstable; but there is no confirming

medical evidence, and his neck was found stable four months after his accident. Id.

Plaintiff claimed he loses feeling in his legs and cannot walk, but there is no medical

evidence to confirm that. Id. at 37. Plaintiff testified that his vision is so bad he cannot

read a phone book, but when given an opthalmological examination, Dr. Taylor

concluded that Plaintiff has no functionally limiting visual impairment. Id. Plaintiff

testified that he has daily headaches that are sharp and last for hours, but the medical

examination reports and the Johnson County Mental Health (JCMH) treatment records do

not reflect that he made such reports to healthcare professionals. Id.

    After reciting this litany of bases to discount Plaintiff's credibility, the ALJ

explained her credibility finding:

> The claimant's medically determinable impairments could reasonably be
> expected to cause some symptoms of the nature alleged, but his statements
> concerning the intensity, persistence and limiting effects of those symptoms
> are not credible. The claimant has made false, incorrect and exaggerated
> statements, undermining his credibility. For purposes of assessing his
> residual functional capacity, his statements are not fully credible, and are no
> more credible than what is directly shown and supported by objective
> medical findings on a 12-month durational basis.

(R. 38) (emphasis added).

### C.   **Analysis**

Plaintiff's claim that the ALJ erroneously considered his allegations of pain is without merit.  His suggestion that the ALJ flippantly dismissed them as "false, incorrect and exaggerated" misses the import of the discussion as summarized above.  The ALJ did not find that Plaintiff had made a few inconsistent or improbable assertions.  Rather, she detailed a pattern and practice of falsity and exaggeration evidenced throughout the record.  She did note, however, that the record evidence confirmed Plaintiff's impairments, and suggested certain limitations, and that such impairments were:  "reason to limit him to light work with other precautions" (R. 36), and "with postural and other limitations," but "do[] not provide a basis for requiring a wheelchair," and she explained that "his obesity is limiting and is taken into account in determining his residual functional capacity."  Id. at 37.

Plaintiff's argument that the "ALJ simply skipped a consideration as to whether or not Plaintiff's medical impairments could reasonably be expected to produce the pain that plaintiff [sic] alleged" is negated by the decision as quoted above.  The ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause some symptoms of the nature alleged."  (R. 38) (emphasis added).  But, she explained that his allegations throughout the record were so false and exaggerated that she was unable to credit any allegations that were not "directly shown and supported by objective medical findings."  Id.

Moreover, the ALJ found that certain of the medical source opinions in the record also had to be discounted because the record revealed that those doctors had relied too uncritically upon Plaintiff's statements and reports.  The ALJ discounted the opinion of Ms. Lawrence, in part because she relied "on the unreliable reporting of the claimant" that he uses a wheelchair unless walking 10 to 12 feet, that he does not drive, and that he is restricted to lifting five pounds.  (R. 42).  She discounted Dr. Stevens's opinion, in part because he did not explain the functional limitations opined and those limitations "appear to be based on subjective reporting by the claimant" that he was positive for 63 symptoms, and that he had needed daytime oxygen since August 2012.  Id. at 43.  She explained that she gave Dr. Kindred's "Cardiac Medical Source Statement" no weight because "[i]t is unclear how the functional limitation [sic] she provided would result from a history of syncope, and from mild coronary artery disease, without angina and with a good coronary prognosis.  Dr. Kindred provided no explanation for the limitations she provided, which may just as well simply have been reported by the claimant."  Id.  And, she discounted Dr. Khan's opinion, in part because it was "substantially informed by the claimant's self-reporting (e.g., regarding headaches)."  Id. at 44.

Finally, Plaintiff's arguments in his Reply Brief ignore the ALJ's discussion as a whole--which shows that the ALJ did not rely only on occasional or sporadic falsities or exaggerations in Plaintiff's reports or activities, and that receipt of unemployment benefits was but one of many factors relied upon by the ALJ.  The evidence overwhelmingly supports the ALJ's finding that Plaintiff's allegations are not credible.

When one recognizes that the court's review of a credibility determination is particularly deferential, it is clear that Plaintiff provides no basis to find error in that determination.

## III.   Evaluation of the Medical Opinions

Plaintiff addresses alleged errors in the ALJ's evaluation of the medical opinions in two sections of his brief.  In the first section, Plaintiff quotes the ALJ's evaluation of the medical opinions of four treating physicians:  Dr. Stepp, who treated Plaintiff after his cervical fracture; Dr. Stevens, a pulmonologist; Dr. Kindred, a cardiologist; and Dr. Khan, who had been seeing Plaintiff regarding his cervical spine for about a month in 2013.  (Pl. Br. 37-38).  He argues that the ALJ did not apply the correct legal standard for evaluating treating physician opinions and had "apparently succumbed to the temptation to 'play doctor' and made her own independent medical findings."  Id. at 38 (citing Delarosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1991); and Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990)).  He quotes Eighth Circuit law for the proposition that an ALJ "may not draw upon [her] own inferences from medical reports," and argues that remand is necessary because the ALJ disregarded these treating physicians' opinions.  Id. at 39 (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975) (citing Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir. 1974) and Willem v. Richardson, 490 F.2d 1247, 1248-49 n.3 (8th Cir. 1974))).

In a later section, Plaintiff claims the ALJ erred by according greater weight to the medical opinions of non-examining physicians, Dr. Parsons, Dr. Timmerman, and Dr. Houser, than to the opinions of the treating physicians.  (Pl. Br. 42-44).  He argues that in

doing so, the ALJ was "essentially trying to make a silk purse out of a sow's ear" because such non-examining source opinions "[b]y their very nature [] can never rise to the level of substantial evidence to support the ALJ's Decision [sic] no matter how much lipstick she places on them." Id. at 44.

The Commissioner argues that the ALJ appropriately weighed the medical opinions, and much of the Commissioner's brief cites evidence tending to support the ALJ's evaluation.  She argues that with regard to the treating source opinions, Plaintiff merely listed the opinions and claimed that the ALJ did not apply the correct legal standard, but did not explain how the ALJ erred.  (Comm'r Br. 15).  She argues that the ALJ did not "play doctor" as Plaintiff suggests, but that she properly considered all of the medical opinions and found some are better supported than others.  Id. at 18.

A.    **Standard for Evaluating Medical Opinions**

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources[1] that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."

---

[1]The regulations define three types of "acceptable medical sources:"

"Treating source:" an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.

"Nontreating source:" an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.

"Nonexamining source:" an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  A physician or psychologist who has treated

a patient frequently over an extended period of time (a treating source) is expected to

have greater insight into the patient's medical condition, and his opinion is generally

entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

But, "the opinion of an examining physician [(a nontreating source)] who only saw the

claimant once is not entitled to the sort of deferential treatment accorded to a treating

physician's opinion."  Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir.

1995)).  However, opinions of nontreating sources are generally given more weight than

the opinions of nonexamining sources who have merely reviewed the medical record.

Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d

1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir.

1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v.

Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

Medical opinions may never be ignored, and where a treating source opinion is not

given controlling weight, all medical opinions will be evaluated by the Commissioner in

accordance with factors contained in the regulations.  20 C.F.R. §§ 404.1527(c),

416.927(c); Social Security Ruling (SSR) 96-5p, West's Soc. Sec. Reporting Serv.,

Rulings 123-24 (Supp. 2015).  Even when a treating source opinion is not given

controlling weight, that opinion is "still entitled to deference and must be weighed using

all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  Watkins v. Barnhart,

350 F.3d 1297, 1300 (10th Cir. 2003).  Those factors are:  (1) length of treatment

relationship and frequency of examination; (2) the nature and extent of the treatment

relationship, including the treatment provided and the kind of examination or testing

performed; (3) the degree to which the physician's opinion is supported by relevant

evidence; (4) consistency between the opinion and the record as a whole; (5) whether or

not the physician is a specialist in the area upon which an opinion is rendered; and

(6) other factors brought to the ALJ's attention which tend to support or contradict the

opinion.  Id. at 1301; 20 C.F.R. §§ 404.1527(c)(2-6), 416.927(c)(2-6); see also Drapeau v.

Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health &

Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

### B.        The ALJ's Evaluation of the Medical Source Opinions

In a thorough discussion over six pages in her decision, the ALJ explained the

weight she had accorded to seventeen medical opinions of fifteen "acceptable medical

sources," including five treating sources (Dr. Stepp - two opinions, Dr. Kindred - two

opinions, Dr. Stevens, Dr. Kahn, and Dr. Zufer[2]), two nontreating sources who had

examined Plaintiff and prepared a report of those examinations (Dr. Stern and Dr.

Taylor), and eight nonexamining sources who reviewed the record evidence and either

documented their opinions in the record (Dr. Maxfield, Dr. Parsons, Dr. Timmerman, and

Dr. Geis) or testified at one of the hearings before the ALJ (Dr. Winkler, Dr. Lewin, Dr.

West, and Dr. Houser).  (R. 39-45).  She also explained the weight she had accorded to

---

[2]The ALJ refers to this physician as "Tahira Zafir, M.D." (R. 44), but the exhibit to
which she cites confirms that the physician is, in fact, "Tahira Zufer, M.D."  (R. 1642).

14

the opinions of four "other medical sources" who were not physicians or psychologists, including three mental healthcare workers at Johnson County Mental Health (Ms. Schmidt, a nurse-practitioner; Mr. Johnston, a licensed professional counselor; and Ms. Fernandez, a social worker and Plaintiff's case manager at JCMH), and an occupational therapist at the University of Kansas Hospital, Ms. Lawrence.  Id. at 40-42.

## C.    Analysis

Plaintiff does not allege error in the ALJ's weighing of each opinion, and the court finds that the ALJ explained her analyses carefully and thoroughly and supported them with record evidence, as required.  Therefore the court will not further address each analysis individually except as necessary when considering and discussing Plaintiff's allegations of error.  The court recognizes that in arguing that the RFC assessment is not supported by medical evidence Plaintiff argued that the ALJ misconstrued and misapplied the medical opinions of Dr. Winkler and Dr. West, and it will address those arguments when it considers whether the RFC assessment is supported by record evidence.

Most of Plaintiff's argument that the ALJ improperly weighed the treating source medical opinions consists of a summary of the standard for evaluating treating source opinions and a quotation (without specific citation or attribution) of the ALJ's evaluations regarding one of Dr. Stepp's opinions, one of Dr. Kindred's opinions, and each of Drs. Stevens's and Kahn's opinion.  (Pl. Br. 36-38).  Then, as discussed above he argues based on the law of the Eighth Circuit that an ALJ may not draw upon her own inferences from

medical reports, and that the ALJ here apparently succumbed to the temptation to "play

doctor."  The court finds no error here.

Plaintiff's citation to Eighth Circuit law is without merit because the law in the

Tenth Circuit is precedent binding upon this court, and because that law is clear with

regard to the ALJ's duty in evaluating medical opinions.  Moreover, neither <u>Lund</u> nor the

law of the Eighth Circuit requires a different conclusion than Tenth Circuit precedent.

Although the <u>Lund</u> opinion does contain the statement, "An administrative law judge may

not draw upon his own inferences from medical reports," that statement is mere dicta.

<u>Riddle v. Colvin</u>, No. 6: 13-03077-CV-S-DGK, 2014 WL 1716182, *5-6 (W.D. Mo. May

1, 2014).  As the <u>Riddle</u> court explained:

> In <u>Lund</u>, the claimant filed for disability benefits based upon severe
> headaches resulting from an automobile accident.  520 F.2d at 783.  After
> the district court affirmed the ALJ's denial of benefits, the Eighth Circuit
> reversed, holding that the ALJ erred in discrediting the claimant's
> subjective complaints of debilitating headaches because no record evidence
> contradicted the claimant's allegations.  <u>Lund</u>, 520 F.2d at 785–86.  In fact,
> the only medical reports in the record corroborated the claimant's
> allegations of disabling headaches.  <u>Id.</u> at 785.  In dicta, however, the Court
> remarked that the ALJ also erred in rejecting the opinion of the claimant's
> treating physician and relying upon his own inferences from the medical
> reports.  <u>Id.</u>

2014 WL 1716182 at *6.

Here, unlike <u>Lund</u>, the ALJ did not ignore any medical reports or solely rely upon

her own unsubstantiated inferences from the record in assessing Plaintiff's RFC.  Rather,

she wrote a thorough opinion discussing the evidence that supported and detracted from

Plaintiff's allegations of disability.  (R. 22–45).  As was the case in <u>Riddle</u>, "in

formulating Plaintiff's RFC, the ALJ did not err in relying upon [other] substantial evidence over the properly discounted opinion[s]."  Riddle, 2014 WL 1716182 at *6 (citing Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011)).  As the Riddle court recognized, the law in the Eighth Circuit is to the same effect as the law of the Tenth Circuit: "'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'"  Martise, 641 F.3d at 927 (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007) (brackets in Martise).

Contrary to Plaintiff's argument, the ALJ did not "play doctor" or otherwise improperly substitute her opinions for those of the medical sources.  Rather, she evaluated each opinion based upon all of the record evidence and stated her reasons for accepting certain of those opinions and discounting others.  That is her duty.  Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."  Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004).  "And the ALJ's RFC assessment is an administrative, rather than a medical determination."  McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing SSR 96-05p, 1996 WL 374183, at *5 (July 1996)).  Because an RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ."  Dixon v. Apfel, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 416.945(a).  Moreover, the final responsibility for determining RFC rests with the

Commissioner, who has delegated that responsibility to the ALJ in a case such as this.  20 C.F.R. §§ 416.927(e)(2), 416.946.

Plaintiff's argument, that "the ALJ improperly accorded great[er] weight to the opinion of . .  non-examining physicians [(Dr. Parsons, Dr. Timmerman, and Dr. Houser)] and [sic] who had not reviewed the majority of the record, over the well-supported opinion of Plaintiff's treating doctors" (Pl. Br. 42), is unavailing.  Here, the majority of Plaintiff's argument involves a statement of the standard for weighing nonexamining source opinions, and quotation (again without citation or attribution) of the ALJ's evaluation of the opinions of Dr. Parsons, Dr. Timmerman, and Dr. Houser.  Id. at 42-43.

As Plaintiff's Brief suggests, the ALJ accorded "some weight" to Dr. Parsons's opinion (R. 39-40), "substantial weight" to Dr. Timmerman's opinion, id. at 40, and "significant weight" to Dr. Houser's testimony.  Id. at 45.  However, the brief also quotes the ALJ's limitations on the weight accorded.  She noted that Dr. Parsons's opinion was "dated just before the claimant's . . . cervical spine injury, so it is not applicable to the period after the injury."  Id. at 40.  She recognized that Dr. Timmerman's opinion was dated about seven weeks after Plaintiff fractured his neck and specifically noted that "12 months duration of functional limitations pursuant to that fracture is the more significant issue."  Id.  She also recognized Dr. Houser's testimony that morphine, which Plaintiff has been prescribed in the past, can cause respiratory depression.  Id. at 45.

Plaintiff argues that "Dr. Houser testified that he formed his opinion that Plaintiff could perform work at the light exertional level simply by adopting the opinion of Dr.

18

Kyle Timmerman," and therefore, Dr. Parsons's, Dr. Timmerman's, and Dr. Houser's opinions all "are woefully out of date." (Pl. Br. 43). This argument suffers from several deficiencies. First, Dr. Houser did not testify that he adopted the opinion of Dr. Timmerman. Rather, he testified that he had received Exhibits 1F through 49F (R. 108), which are all of the medical exhibits except for the following; exhibit 50F, the summary report of the CDIU investigation; exhibit 51F, a treatment note from a visit with Dr. Zufer on August 19, 2013; and exhibits 52F and 53F, reports of opthalmological examination prepared by Dr. Taylor and finding "no work related activities that are affected by [Plaintiff's] vision." (R. 1801). And, Dr. Houser testified regarding his findings after review of those exhibits. (R. 108-14). In response to the question, "do you have an opinion as far as a residual functional capacity is concerned?" (R. 112-13), he responded, "Yes. I would tend to agree with the one that's in the file here which is 16F, Dr. Kyle Hemmerman[3]." This is clearly presented as Dr. Houser's own opinion, not merely his adopting Dr. Timmerman's opinion. Moreover, in contrast to Dr. Timmerman's opinion, Dr. Houser stated that "[w]e could add on that to totally avoid ladders, ropes and scaffolds in this case. Manipulation would put limited overhead, otherwise unlimited." (R. 113) (emphasis added) (compare with Dr. Timmerman's opinion R. 935 (ladder/rope/scaffold - occasionally), and R. 936 (reaching all directions limited)).

---

[3]Exhibit 16F is the Physical Residual Functional Capacity Assessment form completed by Dr. Timmerman. (R. 933-40).

Further, as noted above, Dr. Houser's opinion was based on all of the medical evidence except one treatment note, and Plaintiff does not point out, and the court does not find anything within that note which would detract from Dr. Houser's opinion.  As noted above, the ALJ specifically stated that Dr. Parsons's opinion is not applicable to the period after Plaintiff's injury, and that the "12 months duration of functional limitations pursuant to that fracture is the more significant issue" limiting application of Dr. Timmerman's opinion.  The ALJ's decision was based on evaluation of many more opinions than just those quoted by Plaintiff in his briefs.  And, Plaintiff does not show error in the ALJ's evaluation of those opinions.

Finally, Plaintiff's argument that nonexamining source opinions "by their very nature" cannot constitute "substantial evidence to support the ALJ's [d]ecision" (Pl. Br. 44) (emphasis added), misunderstands the law regarding evaluation of medical opinions. While it is true that courts have found the opinions of nonexamining physicians are worthy of the least weight, that is the general rule, and may be overcome when the ALJ provides "a legally sufficient explanation for doing so."  Robinson, 366 F.3d at 1084. Here, the ALJ provided specific reasons for the weight she accorded to the opinions of these nonexamining sources, and also to the opinions of Drs. Maxfield, Geis, Winkler, Lewin, and West.  Plaintiff points to nothing specific about these opinions or about the ALJ's evaluation thereof which precludes her determination that they are worthy of greater weight than the treating source opinions cited by Plaintiff.

**IV.    RFC Assessment**

Plaintiff claims the ALJ's RFC assessment is not supported by record medical evidence because she erroneously found "that Dr. Winkler said plaintiff [sic] is restricted to a 'light exertional level'." (Pl. Br. 40). He also argues that the ALJ used this erroneous view of Dr. Winkler's testimony to support her evaluation of Dr. West's opinion, and that when she assumed "that [Plaintiff] has been healed and [is] able to return to substantial gainful employment," she misunderstood Dr. Winkler's testimony that the situation with regard to Plaintiff's neck fracture is "stable." Id. at 41. The Commissioner argues that even if Plaintiff is correct in his argument, Dr. Winkler believed Plaintiff was less limited than the RFC assessed, and the stability of Plaintiff's neck fracture was only one factor considered by the ALJ. (Comm'r Br. 19).

As Plaintiff's Brief suggests, SSR 96-8p includes a narrative discussion requirement for an RFC assessment. West's Soc. Sec. Reporting Serv., Rulings 149 (Supp. 2015). The discussion is to cite specific medical facts and nonmedical evidence to describe how the evidence supports each conclusion, discuss how the plaintiff is able to perform sustained work activities, and describe the maximum amount of each work activity the plaintiff can perform. Id. The discussion must include an explanation how any ambiguities and material inconsistencies in the evidence were considered and resolved. Id. The narrative discussion must include consideration of the credibility of plaintiff's allegations of symptoms and consideration of medical opinions regarding plaintiff's capabilities. Id. at 149-50.

Contrary to Plaintiff's argument, the ALJ did not find that Dr. Winkler said Plaintiff is restricted to a light exertional level.  Rather, Plaintiff misunderstands the decision.  As Plaintiff's Brief acknowledges, in explaining the weight accorded to Dr. Winkler's opinion, the ALJ stated "[t]he testimony of neurologist Gerald Winkler, M.D., at the April 3, 2012 hearing is described under Finding 3, and is given substantial weight."  (Pl. Br. 40) (quoting R. 42).  As the ALJ explained, she provided a thorough summary of Dr. Winkler's testimony under finding 3 in her decision.  (R. 26-27).  The court will not repeat it here.  That summary is a fair evaluation of Dr. Winkler's testimony.  (R. 125-30).  The statement, "Due to the impairment, [Plaintiff] is restricted to a light exertional level with other precautions identified" (R.42), is the ALJ's summary of the RFC she assessed for Plaintiff, and is not an expression of Dr. Winkler's opinion or other statement.  A review of her summary of Dr. Winkler's testimony earlier in the decision confirms this fact.  At most, her statement regarding "light exertional level" is an assertion that Dr. Winkler's opinion is consistent with the RFC she assessed.  She goes on to explain that Dr. Winkler's opinion is supported by record evidence, and notes that even as early as July 7, 2011 the University of Kansas Medical Center treatment notes indicated "the cervical fractures were stable with no evidence of abnormal motion or instability."  (R. 42) (Citing Ex. 48F/56 (R. 1737)).[4]

---

[4]Although the record cited is a treatment note dated April 16, 2013, treatment notes from the University of Kansas dated July 11, 2011 state "cervical fx stable no evidence of abnormal motion or instability."  (R. 1364, 1431).

As the Commissioner points out, Dr. Winkler did not agree that a bump might cause paralysis, but stated that "it would have to be more than a casual bump," but would have to be a "trauma sufficient to cause re-fracture or displacement of the fracture fragments." (R. 127-28). He also opined that Plaintiff was capable of "normal activities," but that "activity that would expose him to further trauma or risk of such trauma would be contraindicated." Id. at 128. Plaintiff's counsel at the hearing noted that Dr. Stepp had limited Plaintiff to lifting five pounds, and asked if Dr. Winkler "believe[d] he should be limited to lifting a maximum of five pounds." Id. at 130. Dr. Winkler explained that such a restriction "seems very restrictive, and I would have had a somewhat less restrictive impression myself. And unless [Dr. Stepp] gave a particular reason for being so restrictive I would have difficulty comprehending why he was so restrictive." Id. Further, since the ALJ did not misconstrue Dr. Winkler's opinion, it was not error to rely upon that opinion to discount Dr. West's opinion.

Finally, in relying on the fact that the University of Kansas Medical Center stated that Plaintiff's neck fractures were stable as early as July 7, 2011, the ALJ was not implying that fact alone confirmed Plaintiff was able to return to gainful employment. Rather, as she stated, that fact supports Dr. Winkler's opinion. In fact, as Plaintiff points out in his Brief, Dr. Winkler specifically testified, "The situation [with regard to Plaintiff's neck fracture] is stable and it is at the present time not threatening the integrity of the spinal cord. And therefore surgery would be more risky than conservative management." (R. 127). Plaintiff has shown no error in the ALJ's evaluation of Dr.

23

Winkler's opinion.  Therefore, it was not improper for the ALJ to rely upon those facts in support of her RFC assessment.  Plaintiff has shown no error in this regard.

Plaintiff argued that the hypothetical to the vocational expert "is defective because it does not include the functional restrictions [opined by] Plaintiff's Treating Doctors [sic]."  (Pl. Br. 47).  Because the court found no error in the ALJ's determination to discount the opinions of the treating physicians, it is not error that the hypothetical questions did not include such restrictions.  Therefore, Plaintiff cannot show error in this regard.  Because Plaintiff has shown no error in the Commissioner's decision, that decision must be affirmed.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 8th day of September 2015, at Kansas City, Kansas.

s:/ John W. Lungstrum

**John W. Lungstrum**
**United States District Judge**